**W.L. HARRIS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. WC 91–47–B–D.**

United States District Court,
N.D. Mississippi,
Western Division.

Feb. 18, 1993.

---

**10.** *See* E.O. 11990, § 6(c) and 16 U.S.C.    § 3801(a)(16).

Preston D. Rideout, Jr., Greenwood, MS, for plaintiff.

Patricia D. Rogers, U.S. Attorney's Office, Oxford, MS, for defendant.

## MEMORANDUM OPINION

BIGGERS, District Judge.

The court conducted a bench trial of this cause and requested post-trial memoranda. Having duly considered the testimony and exhibits admitted at trial and the parties' memoranda, the court will set forth findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

The land at issue in this case, approximately 1,900 acres of land previously owned by plaintiff W.L. Harris, entered the Farmers Home Administration ["FmHA"] on September 1, 1987 and was assigned Advice No. 86216 [1] ["86216"]. Based upon the advice of the Fish and Wildlife Service ["FWS"], the FmHA declared 1,004 of those acres as either wetlands or wetland buffer.[2] After notification of his lease-back/buy-back rights, Harris repurchased the property in April of 1989 with the conservation easements in place. Subsequently, alleging that the restrictions would prevent him from farming enough of the property to generate the revenue sufficient to make his payments on the land, Harris filed the present suit.

The court has previously granted summary judgment for the defendant in part, finding that the Agricultural Credit Act of 1987 did not prohibit the defendant's imposition of conservation easements on the plaintiff's property while the same was in government inventory after acquisition by the agency through foreclosure.[3] Accordingly, the case was tried before the court on the plaintiff's claim for review under the Administrative Procedure Act. The plaintiff contends that the agencies responsible for the conservation easements restricting his property acted arbitrarily by improperly designating the property as wetlands when in fact employment of the proper methodology would have resulted in less of his land being placed under easement and, on some portions of his property, no wetland conservation easements. Restated, the sole remaining issue tried before

---

1. 86216 consists of six tracts of land located in Mississippi. Tract I, located in Tallahatchie County, consists of 160 acres, 40 of which the agency declared to be wetlands; Tract II located in Grenada County, consists of 120 acres, 18 of which the agency declared to be wetlands; Tract III, located in Grenada and Tallahatchie Counties, consists of 673 acres, 339 of which the agency declared to be wetlands and 83 to be wetland buffer; Tract IV, located in Choctaw and Webster Counties, consists of 605 acres, 515 acres of which the agency declared to be wetlands and 90 wetland buffer. The agency found "no significant wetland values" remaining on Tracts V (292 acres) and VI (141 acres), located in Tallahatchie and Grenada Counties, respectively.

2. Wetland Buffer is described as non-wetland acreage under easement that has been staked out by the FWS to manage those acres that are properly classified as wetlands. The FWS includes these "buffer zones" in the conservation easement purely for manageability value.

3. Grenada Bank of Mississippi foreclosed on the property at issue in this case in 1987. The defendant purchased the same at the foreclosure sale to protect its lien on the property.

the court was whether or not the agency's wetland delineation was properly performed.[4]

## 1. Lack of Soil Samples

■ Pointing to his lack of field notes and soil samples, the plaintiff alleges that the FWS biologist making the delineation, Charles McCabe, neither consulted nor followed any recognized methodology for wetland delineation but rather arbitrarily performed a cursory "windshield tour" of the property. The plaintiff's expert in the field of wetland delineation, Dr. Thomas Heineke, testified that to be properly classified as "wetlands," the land so considered must possess three characteristics, known in the field as "parameters": hydric soils, hydrophytic vegetation, and wetland hydrology.[5] The delineation made by FWS was done without the benefit of on-site soil samples. The plaintiff's expert opined that by not physically taking soil samples on the property, the defendant's delineation was deficient, not the product of "reasoned decisionmaking essential to informed and evenhanded implementa-

tion of public policy," *Arizona Public Service Co. v. U.S.*, 742 F.2d 644, 649 (D.C.Cir.1984), and must be set aside. The court finds this position untenable.

The record that the agency has compiled on this particular delineation indicates that the following actions were taken: On February 11 1988, the U.S. Fish and Wildlife Service Vicksburg Field Office was requested by FmHA to assist that agency in determining whether or not wetlands existed on the property. The FWS assigned McCabe, an experienced biologist,[6] to inspect the property. McCabe testified that prior to the field inspection of 86216, he consulted the applicable Soil Conservation Service ["SCS"] soil surveys,[7] and compared the soils listed therein to a hydric soil list. On March 22–23, 1988 McCabe, accompanied by two other biologists (one from the Mississippi Fish and Wildlife Service and the other with the Yazoo National Wildlife Refuge), made a field inspection. McCabe testified that the team spent approximately 30 minutes inspecting Tract I; one and one-half hours inspecting Tract II; one

**4.** And not whether their decision was ultimately correct. It is not the province of this court to "substitute its judgment for that of the agency['s]." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). That said, in this case, plaintiff's chosen method of showing the arbitrary nature of the agency's delineation insofar as it allegedly "entirely failed to consider an important aspect of the problem" it faced in the delineation and/or its decision was a "clear error of judgment," *Id.*, was the employment of an expert and the resulting dispute over the differences between the results of the government's delineations and those of the plaintiff's expert. This court has considered such evidence solely "to explain the record and to determine the adequacy of the procedures followed and the facts considered by the [agency] in reaching [its] decision." *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 357 (8th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985). Thus, the plaintiff's attempt to otherwise impeach the agency's decision on grounds of ultimate correctness (via the differences in acreage under easement by comparative analysis of expert opinion) in the delineation is not well founded.

**5.** The plaintiff's expert testified that to fulfill the hydrophytic vegetation parameter, the particular plant that is properly classified as a wetland species (e.g., "spikerush"; "junkus") must prevail in the area identified as wetlands, i.e., great-

er than 50% dominance. Hydric soils are oxygen deficient or characteristically "anaerobic." As detailed in the text, the parties differ over how properly to determine this parameter. The parameter known in the profession as "wetland hydrology" is, in general terms, the presence of water on the land either by inundation or saturation. This criteria may be fulfilled by simple observation—water marks on the trees or standing water on the property or in a hole freshly dug. Listings of the various hydric soil types and common species of hydrophytic vegetation may be found in various government publications, among them cited and relied upon by the parties in this case, Lewis M. Cowardin, Virginia Carter, Francis C. Golet, and Edward T. LaRoe, Fish and Wildlife Service *Classification of Wetlands and Deepwater Habitats of the United States* (1979); National Technical Committee for Hydric Soils, U.S.D.A. Soil Conservation Service *Hydric Soils of the United States* (1987).

**6.** McCabe testified that, at the time of trial, he had approximately 18 years' experience in working with wetlands and wetland issues. At the time of the delineation of 86216, although somewhat lacking in formal classroom training (approximately two weeks), McCabe had delineated approximately 44 pieces of property.

**7.** As described at trial, soil surveys contain a description of the various soil types present in the corresponding region surveyed.

hour inspecting Tract III; and three to four hours inspecting Tract IV. While on site, McCabe took few field notes and no soil samples. Upon returning to the FWS office, McCabe discussed the proposed wetland delineations with the state biologists and his supervisor, Robert Barkley.

McCabe and Barkley returned to the tracts on April 27, 1988 and reviewed McCabe's recommendation for conservation easements at the behest of the FmHA. In reviewing his work, Barkley consulted additional material, including flood data gathered from the Corps of Engineers.[8] Finding no problem with the McCabe delineation, a draft report was submitted to the regional office which also approved the delineation, resulting ultimately in the conservation easements challenged in this case.

It is the policy of FWS in delineating wetlands that a finding of a positive indicator in one or more of the three parameters—soils, hydrology, and vegetation—would satisfy the agency that the property in question was properly wetlands. Thus, for instance, were the biologist making the delineation able through visual observation of the property to identify the prevalent vegetation and additionally found further evidence of wetland hydrology, the presence of hydric soil could be assumed. In this case, McCabe consulted the applicable soil surveys prior to touring the tracts in issue. Those soil surveys indicated the presence of hydric soils on each of the tracts considered except one.[9] His supervisor, Robert Barkley, also reviewed those surveys and gathered flood data

where necessary to confirm the correctness of McCabe's wetland recommendation prior to intra-agency review. Although the plaintiff's expert opined that the lack of soil samples made this delineation substandard, the court finds this testimony lacking in persuasiveness, both for the lack of clear disciplinary support for that conclusion and, more to the point, because the plaintiff's own expert also made similar assumptions when making his own determinations.[10] Properly viewed, the plaintiff's contentions on this point essentially boil down to the proposition that while it is permissible in some instances for his expert to rely upon visual observation alone, the agency's biologist could not. While the plaintiff's expert has more experience than the agency's biologist in terms of the sheer number of wetland delineations made, this court will not engage in a comparative weighing of the relative expertise of each party's experts where it is not necessary to do so. Here it is not. Insofar as the plaintiff's more experienced expert and the less experienced McCabe generally followed the same procedure for delineating the Harris property, the court finds that FWS's failure to take on-site soil samples is not indicative of arbitrary agency action.

### 2. Water Control Structures.

The plaintiff's expert opined that the FWS delineation by McCabe was deficient in that it did not take into account the presence of water control structures on certain tracts which has, in his opinion, artificially created wetland characteristics by the retention of

8. Testimony elicited during the course of the trial indicated that the Vicksburg office is the second oldest field office within the Fish and Wildlife Service, containing records of every Corps of Engineers project since World War II.

9. As reflected in the corresponding county soil surveys (Webster and Choctaw), Tract IV does not contain hydric soils. Furthermore, the defendant's expert, W. Blake Parker, did not find the presence of hydric soils on Tract IV when taking on-site soil samples. However, and as noted by Parker in his report, the county soil surveys indicate that most areas along the Big Black River flood frequently. Parker testified that the soils found on Tract IV (Arkabutla silt loam; Chenneby silt loam and Urbo silt loam) are considered hydric if flooded frequently and

for long duration. Robert Barkley, McCabe's supervisor, testified that when reviewing McCabe's work, he consulted data gathered by the Corps of Engineers. From that data, it was determined that there was never a year from 1971–1991 that all or part of Tract IV did not "go under water" at least once during the growing season for a sufficient period of time necessary to qualify for conversion from non-hydric to hydric soil classification.

10. Although by the plaintiff's standards, a proper delineation would require more, even his expert did not take soil samples on Tract I when conducting his review. In his report, Dr. Heineke stated that "[d]uring the field survey, this site was covered with several feet of water, making it inaccessible for the collection of soils data."

water on portions of the Harris property. Without such structures, the plaintiff's expert testified, the land would in all probability not possess the wetland characteristics that both he and the defendant's expert admittedly found there. Thus, the plaintiff argues and his expert opines, the agency ignored or did not consider an "important part of the problem" when making the challenged delineations on those portions of the property (Tracts I and III) that contain water control structures.

■ The court has problems with this argument for a number of reasons. First, Executive Order 11990, the authority upon which the FmHA relied upon in making the delineation at issue here, defines "wetland" as:

> those areas that are inundated by surface or ground water with a frequency sufficient to support and under normal circumstances does or would support a prevalence of vegetative or aquatic life that requires saturated or seasonally saturated soil conditions for growth and reproduction. Wetlands generally include swamps, marshes, bogs and similar areas such as sloughs, potholes, wet meadows, river overflows, mud flats, and natural ponds.

Although Executive Order 11990 contains no methodology to use in delineating wetlands, a point made much of by the plaintiff as will be taken up *infra*, there is neither a requirement that once wetland conditions are found, (e.g., that "under normal circumstances does or would support a prevalence of vegetative or aquatic life"), the property or land ostensibly so qualifying must be excluded since the "wet" conditions are the result of ·human alteration of the land rather than natural processes. Moreover, of the few courts that have considered this issue, none have made such a distinction, *See Miles v. Yeutter*, No. 89–1348 (D.Ore. July 3, 1990) ("the fact that wetlands may have been artificially created does not necessarily mean that they are excluded from the definitions of wetlands in

Executive Order 11990 and in the Food Security Act"), *aff'd*, 956 F.2d 275 (9th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 77, 121 L.Ed.2d 42 (1992); *Leslie Salt Co. v. U.S.*, 896 F.2d 354 (9th Cir.1990) (fact that wetlands were man made does not prevent land from being properly classified as within the meaning of Clean Water Act definition of wetlands). This court agrees with the above authority. Finding no prohibition within the authority of Executive Order 11990, the court concludes that the source of the wet conditions are irrelevant to the issue of whether or not the land is properly classified as wetlands. That being so, the agency's failure to consider what characteristics those tracts (I & III) would possess without the presence of water control structures is not grounds for concluding the delineation was arbitrary.

■ Second, assuming the significance of the man made alterations to the property via the construction and maintenance of water control structures, the plaintiff adduced no evidence that either McCabe or any of the agency personnel participating in the delineation failed to consider either the fact of the structures or their causal relationship to the "wet" conditions on the property. The evidence adduced instead points in the opposite direction. The government (FWS) constructed some but not all of the structures on the various tracts in issue. In some instances the agency simply replaced worn out or rotted water control devices already present on the property. The plaintiff himself built and maintained some of the water control structures and used the same as did other area farmers, to flood the property for waterfowl management in the winter and for rice production in the growing season. Thus, assuming again that there is some significance to the fact that the property in its natural state (prior to the presence of water control structures) would not be properly classified as "wetlands," there is no evidence that the agency failed to consider their presence in making the delineations.[11]

---

11. Furthermore, the plaintiff's expert testified that, in his opinion, if the water control structures present on portions of Tract III were removed, those regions of the property would have ceased to exhibit wetland characteristics. In this

connection, however, he also noted that the reason the property would have ceased to so exhibit the wetland characteristics was itself the result of earlier drainage efforts on an adjacent creek. If those efforts had not been undertaken, he

In sum, the court finds the presence of water control structures not legally relevant to the ultimate issue of whether or not the delineation is procedurally sufficient in law and turns now to the plaintiff's final contention.

3. Lack of Reference to Published Material

■ Both the plaintiff's and the defendant's experts agree that the three parameter approach detailed above is the proper methodology to follow in making wetland delineations. The plaintiff makes much of the fact that McCabe did not cite or make reference to published material that sets out and details that approach when actually performing the delineation. From this evidence, Harris infers that McCabe employed no methodology in performing the delineations in issue.

As previously mentioned, McCabe, who admittedly has little formal classroom training in wetland classification and delineation, had fourteen years experience in the field at the time of the delineation in issue. Further, the evidence before the court clearly indicates a wealth of institutional knowledge available to the agency participants, and upon which they drew, in making the delineations in issue. McCabe testified that he followed the three parameter approach in delineating 86216. His actions were reviewed by his immediate supervisor. Their testimony, taken together, details a multi-step approach to this delineation that is not procedurally defective simply because the on-site biologist did not carry manuals to the field or cite them in his report. The court cannot perceive any real difference between this argument and the plaintiff's position on the defendant's lack of on-site soil samples. Both are variants of the same theme, namely, that McCabe's on-site inspection was not up to professional standards. The issue involved in this case, however, is whether or not the agency acted arbitrarily in delineating the property in question. Thus, while a procedurally deficient delineation may be indicative of arbitrary agency action, the focus is properly upon the entire process that was undertaken here rather than the minute inadequacies

opined, the property in its natural state would be

perceived by the plaintiff in McCabe's on-site inspection. The court finds the wetland delineation performed by FWS to be procedurally sufficient in law. The procedures employed by the agency in this case included consultation of soil surveys, aerial photography, on-site inspection, agency regional review and approval. That being so, the FmHA's reliance upon the FWS's delineation in placing the conservation easements at issue here is not an arbitrary and capricious action.

In sum, the court finds that the plaintiff has not met his burden of proof in showing the agency's actions to be arbitrary and capricious or an abuse of discretion and, having so found, the plaintiff's claims should be DISMISSED.